IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JIMMY LAWRENCE NANCE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil No. 3:24-cv-1632-RJD |
| | ) | |
| SUSAN RUDOLPH, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

**DALY, Magistrate Judge:[1]**

This matter comes before the Court on Defendant's Motion to Continue Trial Setting (Doc. 80) and Motion for Summary Judgment (Doc. 84) as well as on Plaintiff's Request for Judicial Notice and Motion to Strike (Doc. 92). For the reasons explained below, Defendant's Motion for Summary Judgment (Doc. 84) is **GRANTED**. Plaintiff's Request for Judicial Notice and Motion to Strike (Doc. 92) is **DENIED**, and Defendant's Motion to Continue Trial Setting (Doc. 80) is **DENIED as moot**.

**Background**

Plaintiff Jimmy Lawrence Nance, an inmate of the Federal Bureau of Prisons who is currently incarcerated at the Federal Correctional Institution—Greenville, brought this action for deprivations of his constitutional rights. (Doc. 24, p. 1). Nance alleges that on October 14, 2023, Warden Thomas Lillard ordered that the outside cell windows of approximately 120 cells at FCI Greenville, including those in Plaintiff's cell, be "painted" to block all view of the outside world and direct sunlight. (*Id.* at 2). Plaintiff argues that Warden Lillard's actions create disparate treatment of similarly situated prisoners because only a select number of inmates lack access to

---

[1] This matter has been assigned to the undersigned to conduct all proceedings through the parties' consent pursuant to 28 U.S.C § 636(c) and Federal Rule of Civil Procedure 73. (Doc. 37).

1

sunlight and views of the sky, while other inmates are not being denied access. (*Id.*). After threshold review of the Complaint under 28 U.S.C. § 1915A, Plaintiff was allowed to proceed on the following claims:

> Count 2: Eighth Amendment condition of confinement claim for injunctive relief against Warden Thomas Lillard for painting the windows in Nance's cell, blocking all sunlight and view of the outside; and
>
> Count 4: Fifth Amendment equal protection claim for injunctive relief against Warden Thomas Lillard for painting the windows in Nance's cell, blocking all sunlight and view of the outside.

(*Id.* at 2, 9).[2] The current Warden of FCI Greenville, Susan Rudolph, was thereafter substituted for Defendant Lillard. (Docs. 76 & 79).

On March 17, 2026, Defendant moved to continue the trial setting of August 25, 2026. (Doc. 80), to which Plaintiff objected (Doc. 82). On April 28, 2026, Defendant filed her Motion for Summary Judgment that includes a Statement of Material Facts with proper citation to the record. (Doc. 84). Defendant also served Plaintiff with a notice under Rule 56.1 advising Plaintiff of the consequences of failing to respond to the motion or to comply with Rule 56 of the Federal Rules of Civil Procedure ("Rule 56") and Local Rule 56.1. (Doc. 85). On June 3, 2026, Plaintiff filed a response opposing the motion, including a Response to Defendant's Statement of Material Facts. (Docs. 90 & 91-1). Plaintiff also attached to his response a Statement of Disputed Facts, summarizing the material facts that he argues are genuinely disputed. (Doc. 91-2). Thereafter, Plaintiff filed his Request for Judicial Notice and Motion to Strike, arguing that Defendant has waived any argument that the alleged constitutional conduct was reasonably related to a legitimate penological purpose because this defense was not raised during the prison administrative

---

[2] Plaintiff's claims for damages were dismissed because Plaintiff had failed to state a claim under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971). (Doc. 24). Plaintiff was allowed to proceed only on his claims for injunctive relief under 28 U.S.C. § 1331, which "provides jurisdiction for the exercise of the traditional powers of equity in actions arising under federal law," without the need for any "more specific statutory basis." (*Id.* (quoting *Simmat v. United States Bureau of Prisons*, 413 F.3d 1225, 1232 (10th Cir. 2005)).

proceedings. (Doc. 92). On June 17, 2023, Defendant filed a reply as well as a response in opposition to Plaintiff's motion. (Docs. 93 & 94). On July 13, 2026, Plaintiff filed a Sur-Reply. (Doc. 95).

## Summary Judgment Standard

Summary judgment is appropriate only if the moving party can demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *see also Ruffin-Thompkins v. Experian Information Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005). The moving party bears the initial burden of demonstrating the lack of any genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Estate of Simpson v. Gorbett*, 863 F.3d 740, 745 (7th Cir. 2017) (quoting *Anderson*, 477 U.S. at 248). Further, a "nonmovant's failure to respond to a summary judgment motion, or failure to comply with Local Rule 56.1, does not, . . . automatically result in judgment for the movant"; the movant "must still demonstrate that it is entitled to judgment as a matter of law." *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012) (citing *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006); *Reales v. Consolidated Rail Corp.*, 84 F.3d 993, 997 (7th Cir. 1996). In considering a summary judgment motion, the district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013) (citation omitted).

**<u>Compliance with Federal Rule of Civil Procedure 56 and Local Rules 7 & 56.1</u>**

Under Rule 56 and Local Rule 56.1, a party opposing a motion for summary judgment and asserting that a fact is genuinely disputed must support the assertion with citation "to particular parts of materials in the record," Fed. R. Civ. P. 56(c)(1)(A), "including page number(s), upon which the opposing party relies, where available." SDIL-LR 56.1(b). The Court is not required to consider material that is not properly cited in a Statement of Material Facts or in a response thereto, and it will "disregard any asserted fact that is not supported with a citation to the record, unless the factual basis for the assertion is clearly identifiable from the parties' related citations or permissible inference." *See* Fed. R. Civ. P. 56(c)(3); SDIL-LR 56.1(f). "All material facts set forth in a Statement of Material Facts . . . shall be deemed admitted for purposes of summary judgment unless specifically disputed." Local Rule 56.1 "applies equally to represented and *pro se* parties." SDIL-LR 56.1(j). Further, the Court does not accept sur-reply briefs under any circumstances. SDIL-7.1(a)(4).

Here, Plaintiff's original response to Defendant's Statement of Material Facts and his Statement of Disputed Facts lack any citation to the record. (Docs. 91-1 & 91-2). In his Sur-Reply, Plaintiff attempts to correct this deficiency by attaching a "corrected" version of his response to the motion for summary judgment. (Doc. 95, pp. 7-26). However, under Local Rules, the Court cannot accept any sur-reply, and Plaintiff never sought leave to file a corrected response. He argues that he did not include citations in his original response because he was unaware of the local rules. However, along with the Motion for Summary Judgment, Defendant served Plaintiff with a Notice that recited Federal Rule of Civil Procedure 56 and Local Rule 56.1 verbatim and advised Plaintiff of the consequences of his failure to comply with them. (Doc. 85).

In any case, Plaintiff's "corrected response" to Defendant's Statement of Material Facts still, in most parts, does not comply with Rule 56 and Local Rule 56.1. In response to most of

Defendant's factual allegations, Plaintiff cites to certain paragraphs in "Defendant's response." The Court assumes this is a reference to Defendant's Statement of Material Facts in his Motion for Summary Judgment. However, to properly show that a factual contention is genuinely disputed, Plaintiff must cite admissible evidence in the record supporting his version of the events. Merely citing the Defendant's factual allegations does not support Plaintiff's factual contention and is insufficient to raise a triable issue.

Plaintiff only cites to his own exhibits in his response to Defendant's factual allegations in ¶¶ 19-20. (Doc. 36, p. 15, ¶¶ 19-20). While not required under Local Rules, the Court will consider those factual allegations in its analysis. However, all remaining factual allegations set forth in Defendant's Statement of Material Facts are being deemed admitted unless they are unsupported by the cited record based on the Court's independent review. *See* SDIL-LR 56.1(g). The Court will still review these facts in the light most favorable to Plaintiff. The Court will also not consider any other arguments Plaintiff raised in his sur-reply, as such filings are not permitted under the Local Rules.

### Plaintiff's Request for Judicial Notice and Motion to Strike (Doc. 92)

Plaintiff filed a motion arguing that Defendant has waived any argument that the painting of the cell windows served a legitimate penological interest because Warden Lillard did not reference security concerns in response to Plaintiff's administrative remedy requests. This argument lacks merit. As Defendant points out, neither the Prison Litigation Reform Act nor the Federal Rules of Civil Procedure requires defendants in a prisoner suit to raise their defenses in the administrative phase. *See* 42 U.S.C. § 1997e; 28 C.F.R. § 542.10 *et. seq*; Fed. R. Civ. P. 8, 12. Accordingly, Plaintiff's Request for Judicial Notice and Motion to Strike (Doc. 92) is **DENIED**.

**Findings of Facts**

At all relevant times, Nance has been incarcerated at FCI Greenville. (Doc. 84, ¶ 53). FCI Greenville is a medium security federal correctional institution housing over 1,000 male inmates. (Doc. 84, ¶ 1). Thomas Lillard served as the Warden of FCI Greenville from May 2023 to June 2025, and was the Chief Executive Officer and official custodian for the inmates incarcerated at FCI Greenville, having administrative and organizational control over the functions of the institution, including maintaining its security. (*Id.* at ¶¶ 1-5).

In the months prior to October 2023 and throughout Warden Lillard's tenure, there were multiple drone sightings and contraband drops at FCI Greenville. (Doc. 84, ¶¶ 9, 16). This raised security concerns regarding the inmates housed in Greenville's perimeter-facing cells. (*Id.* at ¶ 6). Those cells had windows with a clear view of the prison perimeter, allowing perimeter staff patrols to be observed and inmates housed therein to avoid them and to assist with drone-delivered contraband drops. (*Id.* at ¶¶ 7-8). The inmates living in those cells come from a variety of backgrounds, including different races and religions. (*Id.* at ¶ 24).

In an effort to address this security concern and curb drone contraband drops, in October 2023, Warden Lillard directed the application of Krylon Specialty Privacy Glass on the perimeter cell windows at FCI Greenville. (Doc. 84, ¶¶ 17-19).[3] The spray is semi-transparent, obscuring a clear view of the outside but allowing indirect natural light.[4] (*Id.* at ¶ 20). While the spray obscures

---

[3] In his "corrected response," Plaintiff states that he does not disagree with Defendant's statement, but he cites to one of his exhibits "for additional information." (Doc. 95, ¶ 19). The cited exhibit appears to be an AI-generated Google search summary listing the different types of Krylon Specialty Glass sprays. As Defendant points out, the AI summaries constitute inadmissible hearsay and also lack any evidentiary foundation. In any case, Plaintiff does not dispute that factual allegation and merely offered the exhibit for "additional information," which is insufficient to create a genuine dispute. (Doc. 95, p. 15, ¶ 19).

[4] In his "corrected response," Plaintiff disputes that his cell receives any "natural light." (Doc. 95, ¶ 20). He argues that the diffused or indirect light that passes through his cell window is not "natural light" because it is not "unimpeded." He points again to AI-generated Google search summaries, listing several definitions of terms such as "natural light," "diffused light," and "translucent." (*Id.*; Doc. 91-3, pp. 3-5). However, even under the Merriam–Webster Online Dictionary, on which Plaintiff relies in his exhibits, natural light is defined as the "light from the sun" or "sunlight." *Natural Light Definition,* Merriam–Webster Online

a clear view of the outside, the outline of items placed on the interior cell window sill can be seen through the cell window from the exterior of the facility. (*Id.* at ¶ 21; Doc. 89). This spray was applied only to cell windows having a view of the outer perimeter of the institution to preclude the inmates housed therein from viewing outside perimeter patrols to prevent inmates from facilitating drone contraband drops by assisting in avoiding the patrols. (*Id.* at ¶¶ 22-23, 25). Moving inmates out of the perimeter-facing cells is not feasible, as there is not adequate space in the institution to house all inmates in interior-facing cells. (*Id.* at ¶ 28). Further, it was unnecessary to apply the translucent spray to all cell windows, including those facing the institution's interior grounds, as the purpose of the spray was to prevent inmates from observing staff patrols along the perimeter of the prison grounds. (*Id.* at ¶ 29).

Susan Rudolph, the Warden of FCI Greenville, currently holds the same responsibilities held by Warden Lillard during his tenure. (Doc. 84, ¶ 31). Warden Rudolph is aware of the security concerns regarding the introduction of contraband via drone, which led to the application of the translucent spray in October 2023, and remains a concern. (*Id.* at ¶¶ 32-34).

Plaintiff is housed in Housing Unit 4A, Cell 244, one of the cells on which windows were treated with the translucent spray. (Doc. 84, ¶ 55).[5] Photographs of Plaintiff's cell show natural light entering Plaintiff's cell from the exterior cell window that has been treated with the translucent spray. (*Id.* at ¶¶ 56-57; Doc. 89). There are also photographs of the outside of Plaintiff's cell showing that the outline of items placed on the interior cell window sill can be seen through the cell window from the exterior of the facility. (*Id.* at ¶ 21; Doc. 89). Plaintiff's cell also contains two artificial lights. (*Id.* at ¶ 58).

---

Dictionary, https://www.merriam-webster.com/dictionary/natural%20light (last visited Jul. 15, 2026). The light penetrating Plaintiff's cell window, even though diffused, indirect, or impeded, still comes from the sun, and is, therefore, natural light. Accordingly, Plaintiff cited record does not support his allegation that no natural light enters his cell.

[5] Plaintiff states in his response that he has since been transferred to Cell 242, whose windows have also been painted with the translucent spray. (Doc. 91-1, p. 15).

Defendant provided a summary of Plaintiff's daily activities and his respective exposure to sunlight. (Doc. 84, ¶¶ 59-97). Plaintiff is in a lockdown in his cell between 9:30 p.m. and 5:30 a.m. (*Id.* at ¶¶ 59-77). Based on Plaintiff's daily activities on a typical weekday, Plaintiff only spends an average of 6 hours in his cell between 5:30 a.m. and 9:30 p.m. (*Id.*). Specifically, Plaintiff wakes up at 5:30 a.m., and then generally leaves his cell around 6:20 a.m. to go to the common area of his housing unit until around 6:45 a.m. to 7:00 a.m. (*Id.* at ¶¶ 59-61). Plaintiff then leaves his housing unit and goes to the "main line" dining building for breakfast. (*Id.* at ¶ 62). To get to and from his housing unit and the dining building, Plaintiff must walk across the prison facility's outdoor campus. (*Id.* at ¶ 63). After breakfast, at or around 7:15 a.m., Plaintiff returns to his cell until 7:30 a.m., when he is called for work at the UNICOR facility that is separate from his housing unit. (*Id.* at ¶¶ 64-65). To get to and from his housing unit and the UNICOR work facility, Plaintiff must walk across the prison facility's outdoor campus. (*Id.* at ¶¶ 66). Plaintiff works at his UNICOR job five days a week, Monday through Friday, from 7:30 a.m. to 11:00 a.m., and from 11:30 a.m. to 3:00 p.m. (*Id.* at ¶¶ 67-68 & 71). Between 11:00 a.m. and 11:30 a.m., Plaintiff has lunch in the main line dining building, which is separate from the UNICOR work facility. (*Id.* at ¶ 69). After leaving his UNICOR job, Plaintiff typically returns to his housing unit. (*Id.* at ¶ 70). Plaintiff is in a lockdown in his cell between 3:30 p.m. and 5:00 p.m. (*Id.* at ¶ 73). After 5:00 p.m., Plaintiff participates in "no chow rec" until 6:30 p.m. to 7:30 p.m. (*Id.* at ¶¶ 74-75). During that time, he either exercises outdoors or lifts weights in the prison gym, depending on the weather and time of year. (*Id.* at ¶ 76). Then, he typically spends time between the common area of his housing unit and his cell until he is locked down at 9:30 p.m. (*Id.* at ¶ 77). On weekends, weather permitting, Plaintiff typically spends 4 hours per day (Saturdays and Sundays) on outdoor recreation year-round. (*Id.* at ¶¶ 81, 84). Plaintiff volunteers for outdoor work, such as weed eating, and recently completed a six-month outdoor project. (*Id.* at ¶¶ 85-89).

8

Besides Plaintiff's cell, there are other areas in the institution with windows that Plaintiff can see out of, including the prison visiting room, the hallways between the housing units, the main line building, the Education Department, and the indoor recreation area. (*Id.* at ¶¶ 90-95). Plaintiff also passes through the outdoor campus daily to reach the UNICOR work facility, the Education Department, and the dining building, and to return to his cell. (*Id.* at ¶¶ 63, 66, 83).

**Discussion**

**Count 2**

In Count 2, Plaintiff raised an Eighth Amendment condition of confinement claim for injunctive relief for painting his cell window, blocking all sunlight and view of the outside. It is well settled that the "Constitution does not mandate comfortable prisons" but also does not "permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970, 1976, 128 L. Ed. 2d 811 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981) (quotation marks omitted)). The conditions under which a prisoner is "confined are subject to scrutiny under the Eighth Amendment," which prohibits "cruel and unusual punishment." *Id.* (citing *Helling v. McKinney*, 509 U.S. 25, 31, 113 S. Ct. 2475, 2479, 125 L. Ed. 2d 22 (1993). To prevail on his Eighth Amendment claim of unconstitutional conditions of confinement, Plaintiff needs to show that he was confined under conditions that denied him "the minimal civilized measure of life's necessities." *Rhodes,* 452 U.S. at 347. Plaintiff must also show that Defendant acted with a culpable state of mind, that is, knowingly disregarding an inmate's substantial risk of serious harm by failing to take reasonable measures to prevent it. *Farmer,* 511 U.S. at 847.

Here, Plaintiff argues that he is subjected to unconstitutional conditions of confinement because the application of the spray on his cell window deprives him of direct and unobscured access to sunlight and of a view to the outside. There does not appear to be any binding authority directly on point. District courts addressing this issue have noted that "direct sunlight itself does

9

not appear to be a 'basic human need,'" but an inmate may "establish that sunlight is a necessary element to his physical or psychological health, or that lack of sunlight otherwise exposes him to a substantial risk of serious harm." *See Lindell v. Schneiter*, 531 F. Supp. 2d 1005, 1013 (W.D. Wis. 2008); *see also Homan v. Milwaukee Cnty. Jail*, No. 25-CV-1806-PP, 2026 WL 483321, at *2 (E.D. Wis. Feb. 20, 2026) (dismissing a complaint because the inmate did not state for how long he was deprived of any exposure to sunlight); *Ellis v. Santerelli*, No. 20 C 5959, 2023 WL 4976180, at *10 (N.D. Ill. Aug. 3, 2023) (dismissing an inmate's Eighth Amendment claim when there was no evidence that he "suffered any ill-effects on his health" from what the alleged poor ventilation and lack of sunlight); *Gonzalez v. Josephson*, No. 14-CV-4366, 2019 WL 1013737, at *20 (N.D. Ill. Mar. 4, 2019) (dismissing pretrial detainees' claim for inadequate access to sunlight where even though some of the cells did not have windows, the detainees still had access to the dayroom and indoor recreation area both of which had large windows and there was no indication of medical issues as a result of the alleged lack of access to sunlight).

Plaintiff points to a district court case that has noted that the Seventh Circuit has "suggested" a constitutional right to "sunshine and fresh air." *Passmore v. Josephson*, 376 F. Supp. 3d 874, 886 (N.D. Ill. 2019) (citing *Jerricks v. Schomig*, 65 F. App'x 57, 58 (7th Cir. 2003)). A closer look at *Jerricks*, however, shows that the Seventh Circuit did not make such a broad finding. There, a district court had dismissed for failure to state a claim an inmate's complaint alleging unconstitutional conditions of confinement for denial of "yard access, sunshine, and fresh air every day from July 29, 1999 until October 2000." *Jerricks*, 65 F. App'x at 58. The Seventh Circuit reversed, noting that it has found constitutional violations based on "less severe deprivations" of yard or outdoor access. *Id.* (collecting case law). Therefore, the issue there was an inmate's access to the outdoors and sunlight in general, not the direct and unobscured access to sunlight from an inmate's cell window as Plaintiff asserts in this case.

10

A closer reading of relevant case law shows that the lack of direct sunlight or outside view from the cell does not appear to implicate the Eighth Amendment when it is not prolonged, the inmate has otherwise adequate outdoor access or sunlight exposure, and there is no evidence that the lack of sunlight exposes the inmate to a substantial risk of serious harm. *See Adams v. Pate*, 445 F.2d 105 (7th Cir. 1971) (finding no constitutional violation where an inmate was confined in 7 by 15-foot segregation cell with 8-foot ceiling which was equipped with radiator, running water, flush toilet, ceiling light and frosted window covered by mesh screen); *Jones v. Triti*, No. 22-CV-694-PP, 2023 WL 8653999, at *4 (E.D. Wis. Dec. 14, 2023) (dismissing a claim of unconstitutional conditions of confinement where the windows of the jail had a covering or film that blocked sunlight from coming into the jail but there was no indication that the inmate did not have otherwise access to the outdoors); *Gaustad v. Frank*, No. 05-C-187, 2007 WL 528199, at *4 (E.D. Wis. Feb. 15, 2007) (dismissing a conditions of confinement claim of an inmate who had been confined in a segregation cell unit with frosted window that obstructed sunlight and outside view because he had spent less than four months in there and the overall conditions did not rise to the level of severity that violate an inmate's rights); *Lindell v. Frank, No. 06-C-608-C, 2006 WL 3300379*, at *3 (W.D. Wis. Nov. 13, 2006) (allowing an inmate to proceed with a conditions of confinement alleging that he was denied outdoor recreation for all but 2½ hours each week which negatively impacted his mental health).

Here, the record shows that the spray applied to Plaintiff's cell window still allows natural light to come into the cell. Further, Plaintiff has not argued that the two artificial lights do not adequately illuminate his cell. The undisputed evidence also shows that during a typical week, Plaintiff receives adequate exposure to sunlight and a view of the outside. Weather permitting, Plaintiff has at least 8 hours of direct sunlight exposure while outdoors during the weekends. Further, each evening, he generally spends 1.5 hours on recreation, which can be either outdoors

or in the indoor recreation area that has windows that allow inmates to see outside. Each day, Plaintiff's movement to and from the main line dining, his job, and recreation all require him to go outdoors. Numerous areas of the institution also have windows allowing Plaintiff to see outside, including the main line building, the visiting room, the indoor recreation area, and the education department. The hallways traveled by inmates between the housing units of the institution also contain windows allowing Plaintiff to see outside. Plaintiff also takes the opportunity to do work outside, such as weed eating, and recently completed a long-term outdoor project.

Plaintiff does not dispute these alternative sources of access to daylight and view to the outside. He contends, however, that they are irrelevant because he is not "housed" in those areas. In other words, he argues that he is subjected to cruel and unusual punishment simply because his cell does not offer direct and unobstructed access to sunlight and outside view, regardless of his otherwise unrestricted access to sunlight and the outdoors. Yet he cites no authority to support that the Eighth Amendment warrants such amenities. He only points to non-binding authority that is readily distinguishable from the case at bar. *See Martino v. Carey*, 563 F. Supp. 984, 999 (D. Or. 1983) (noting that the Eighth Amendment requires "a minimum level of illumination" through natural *or artificial light in the cells* and finding that the inmate's rights were violated where they were housed in cells "as dark as a dungeon" with inadequate natural or artificial light); *Bono v. Saxbe*, 620 F.2d 609, 617 (7th Cir. 1980) (discussing "poor lighting" *even with artificial light* that prevented prisoners from reading); *Rutherford v. Pitchess*, 457 F. Supp. 104, 112 (C.D. Cal. 1978) (where inmates went "for many months without even seeing a bush or a tree or any human activity outside the jail"); *Rhem v. Malcolm*, 432 F. Supp. 769, 773 (S.D.N.Y. 1977) ("Most detainees at MHD are unable to see out of the building" and lack "contact with sun, sky, street or the outside world" with outdoor exercise opportunity *not exceeding 50 minutes per week in a small rooftop area*); *Hamilton v. Landrieu*, 351 F. Supp. 549, 554 (E.D. La. 1972) (windows had "sheet metal

covers and boarding on the outside of the windows"). Plaintiff's reliance on these cases is misplaced: his conditions of confinement are readily distinguishable from those faced by the inmates there.

He further argues that courts have upheld only the blocking of windows for inmates in segregation, which is short-term and distinct from the extended housing in general population cells. Yet, at least one district court has upheld the confinement of pretrial detainees for over three years in cells without windows, where the housing unit had dayrooms and indoor recreation areas with large windows. *Gonzalez*, 2019 WL 1013737, at *20.

Plaintiff has also not shown that the lack of sunlight has exposed him to a substantial risk of serious harm. Plaintiff alleges in his response to the motion that he had an eye hemorrhage on December 1, 2026, which he attributes to inadequate lighting in his cell. Yet, he has not provided any medical records or other supportive evidence to show any connection between the alleged injury and the lack of unobscured direct sunlight in his cell. Plaintiff's uncorroborated allegations in his Response are insufficient at this stage to defeat summary judgment. *See Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 614 (7th Cir. 2022) ("A party who fails to produce evidence sufficient to establish an element essential to that party's case on which they bear the burden of proof cannot survive a summary judgment challenge.").

Plaintiff argues that the lack of direct sunlight in cells can cause a "myriad of other issues," such as depression. (Doc. 91, p. 5). He even attempts to connect a purported suicide by another inmate to the sprayed cell windows. He offers numerous, mostly unsworn, statements by other inmates housed in cells with similarly treated windows describing the impact on their mental and physical health. He further asks the Court to take judicial notice of an expert testimony on a completely unrelated case regarding the connection between circadian rhythm and certain ailments. But Plaintiff has not even alleged that he has personally suffered any such consequences,

13

let alone offered any medical evidence to support any connection between any serious mental health impact that those inmates have suffered and the spraying of the windows. Neither has Plaintiff offered any evidence of a risk of serious harm that is "sure or very likely" to occur, given his typical weekly outdoor access and exposure to sunlight. *See Baze v. Rees*, 553 U.S. 35, 50, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008) (quoting *Helling*, 509 U.S. at 33) (noting that an "objectively intolerable risk of harm" must be "'sure or very likely to cause serious illness and needless suffering'" to trigger protection under the Eighth Amendment).

Based on the record viewed in the light most favorable to Plaintiff, no reasonable jury could find that Plaintiff has suffered an objectively serious medical need as a result of the application of the spray on his cell window. "Simply put, under the law as interpreted by the Supreme Court and the Seventh Circuit, not every inconvenience, uncomfortable, or less than ideal condition violates the constitution." *Ellis*, 2023 WL 4976180, at *11 (citing *Harris v. Fleming*, 839 F.2d 1232, 1235 (7th Cir. 1988); *Shelby Cty. Jail Inmates v. Westlake*, 798 F.2d 1085, 1087 (7th Cir. 1986)). Therefore, Defendant is entitled to summary judgment on Count 2 of the Complaint.[6]

### Count 4

In Count 4, Plaintiff asserts that his equal protection rights have been violated by the facility's decision to apply the translucent spray on the windows of the inmates housed in the exterior perimeter-facing cells only. He argues that the 200 affected inmates are treated differently from the facility's remaining 700 inmates without any disciplinary basis, simply because of their cells' location.

---

[6] Defendant argues, alternatively, that dismissal of Count 2 is warranted under *Turner v. Safely* because the covering of the windows with the translucent paint served the legitimate penological purpose of securing the safety of the facility. 482 U.S. 78, 89, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987). However, the Supreme Court has clarified that the deliberate indifference standard, rather than *Turner*'s penological-purpose test, governs Eighth Amendment claims of cruel and unusual punishment in prison. *Johnson v. California*, 543 U.S. 499, 511, 125 S. Ct. 1141, 1149–50, 160 L. Ed. 2d 949 (2005); *see also Garrett v. Lumpkin*, 96 F.4th 896, 901–02 (5th Cir. 2024) (finding *Johnson*'s relevant language binding and declining to apply *Turner*'s penological-purpose test to an inmate's conditions-of-confinement claim).

Under the equal protection component of the Fifth Amendment, "all persons similarly situated should be treated alike."[7] *United States v. Brucker*, 646 F.3d 1012, 1016–17 (7th Cir. 2011) (citing *Plyler v. Doe,* 457 U.S. 202, 216, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982)). When the alleged disparate treatment is "not based on a suspect class and does not affect a fundamental right, prison administrators may treat inmates differently as long as the unequal treatment is rationally related to a legitimate penological interest." *Flynn v. Thatcher*, 819 F.3d 990, 991 (7th Cir. 2016) (citing cases). "Prison classifications are presumed to be rational and will be upheld if any justification for them can be conceived." *Id*.

For instance, the Seventh Circuit upheld a prison's policy of restricting access to commissary items by inmates in administrative segregation, where there were no allegations of restrictions based on a suspect class, and allegations indicated restrictions were logically connected to promoting prison security. *Griffin v. Carter*, No. 23-1462, 2023 WL 4946734 (7th Cir. Aug. 3, 2023). Likewise, the court found that banning in-person meetings between inmates and reporters at the Bureau of Prisons' most secure institutions based on security concerns did not violate the inmates' Equal Protection Clause. *Hammer v. Ashcroft*, 570 F.3d 798, 799 – 801 (7th Cir. 2009).

Plaintiff agrees that this case does not implicate a suspected class. He argues, however, that he has a "fundamental right" in "sunshine and fresh air" under *Jerricks*. Yet, the application of the translucent paint on his cell window does not implicate that right. There is no dispute that Plaintiff still has adequate access to the outdoors during a typical week, as well as access to direct sunlight in other areas of the facility, which he typically visits daily. Rather, the right asserted here is much narrower: a convicted inmate's right to direct and unobstructed access to sunlight and outside view

---

[7] It is well settled that, while the equal protection warranties of the Fourteenth Amendment apply only to the States, the same protections are extended against the federal government through the "equal protection component" of the Fifth Amendment. *See S.F. Arts & Athletics, Inc. v. U.S. Olympic Comm.,* 483 U.S. 522, 542 n. 21, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987). The analysis of equal protection claims under the Fifth and Fourteenth Amendments is the same. *Id.*

from his cell. *See Dep't of State v. Munoz*, 602 U.S. 899, 910, 144 S. Ct. 1812, 1822, 219 L. Ed.

2d 507 (2024) (directing that the analysis should begin with a "careful description of the asserted

fundamental liberty interest."). The Court has not found, and Plaintiff has not pointed to any

authority supporting the existence of such a fundamental right "deeply rooted in this Nation's

history and tradition." *Washington v. Glucksberg*, 521 U.S. 702, 721, 117 S. Ct. 2258, 2268, 138

L. Ed. 2d 772 (1997).

Plaintiff further relies on *Lock v. Jenkins* for the proposition that the inmates housed in the

cells with the treated windows are denied equal protection under the law by being held in

significantly more burdensome conditions without any justification for such treatment. *Lock v.*

*Jenkins*, 641 F.2d 488 (7th Cir. 1981). But *Lock* dealt with the improper classification between

pretrial detainees, who were subjected to significantly harsher conditions of confinement, and

convicted inmates, who enjoyed better conditions of confinement. The Seventh Circuit explained

that under equal protection and due process mandates, "pretrial detainees may not be treated less

favorably than convicted persons, unless the difference in treatment is justified by a legitimate

government interest." *Lock*, 641 F.2d at 497. Here, Plaintiff, a convicted inmate, is not entitled to

the more demanding due process and equal protection standards applicable to pretrial detainees.

*See Roundtree v. Dart*, No. 23-2576, 2025 WL 401207, at *2 (7th Cir. Feb. 5, 2025) ("a detainee

does not have to satisfy the more exacting standard applicable to a convicted prisoner, who has a

liberty interest only when a punishment results in an 'atypical and significant hardship on the

inmate in relation to the ordinary incidents of prison life.'"). Accordingly, *Lock* is inapposite. In

any case, the court there noted that even for pretrial detainees, the more burdensome conditions of

confinement would pass equal protection muster if they were rationally related to a legitimate

governmental interest. *Lock*, 641 F.2d at 497.

16

Because the alleged disparate treatment here is not based on a suspect class and does not affect a fundamental right, rational-basis review applies. Defendant has satisfied its burden of showing that applying paint only to the windows of the exterior-perimeter-facing cells serves the legitimate interests of preventing the introduction of contraband and maintaining institutional security. The record shows that the purpose of that measure is to inhibit the introduction of drone-dropped contraband into the facility, which has been a continuing issue. Defendant has shown that the translucent spray prevents inmates in those cells from observing staff perimeter patrols and assisting outside individuals with the introduction of contraband. As Defendant points out, without knowledge of the timing and presence of perimeter staff patrols, it is more difficult to drop contraband into the facility successfully.

Plaintiff counters that applying the spray to the windows of the perimeter-facing cells is ineffective because incidents of drones dropping contraband have increased since the measure has been adopted. However, the applicable standard in this case is lenient: Defendant only needs to show that there was some reasonable relation between the legitimate penological purpose of restricting the introduction of contraband and drugs into the facility and restricting the window view of inmates in the exterior perimeter-facing cells. The adopted measure need not be narrowly tailored to that legitimate purpose. *See Flynn*, 819 F.3d at 991 ("Prison classifications are presumed to be rational and will be upheld if any justification for them can be conceived."). Based on the record, no reasonable jury could find that Defendant has not satisfied that low threshold.

Accordingly, Defendant is entitled to summary judgment on Count 4 of the Complaint.

## Conclusion

For these reasons, Defendant's Motion for Summary Judgment (Doc. 84) is **GRANTED**. Plaintiff's Request for Judicial Notice and Motion to Strike (Doc. 92) is **DENIED**, and Defendant's Motion to Continue Trial Setting (Doc. 80) is **DENIED as moot**. This case is

17

**DISMISSED with prejudice**. The Clerk of Court is **DIRECTED** to enter judgment accordingly and close the case.

**IT IS SO ORDERED.**

**DATED: July 15, 2026**

**Hon. Reona J. Daly**
**United States Magistrate Judge**

18